Mr. Justice Johnson,
dissented. — The reasoning upon this cause, must be utterly unintelligible to those who hear it, unless premised by the following state of facts:
The grant to William Penn, vested in him and *295 his heirs, both the soil and sovereignty of the State of Pennsylvania, subject to a few reservations of right and power, not material to be noticed here. But, before his colony took their departure from England, he entered into a variety of stipulations, restricting the exercise of both his power and rights over the territory which they were about to occupy. These are known by the epithets of his conditions or concessions; and it is by one of the articles of this instrument that he precludes himself from setting fipart more than one tenth of the soil, for the several and individual use of his family. The rest was to be granted out to settlers, on terms which were to be common to all except those who purchased within the proprietary tenths, with whom he was at liberty to contract/ as he pleased for the sale of his lands.
By the 17th section of the charter, there was power given to the proprietary to erect manors, with right of court-baron, frank-pledge, &c., and to grant the land therein for estates, which the grantees could not devest of the incident of being held directly of the manor, or the grantee of the manor, who is denominated lord of the manor. The manor of Springetsbury, within which this land lies, was surveyed for the use of the proprie,-taries, and surveyed as a manor. There was evidence in the cause below,- of its having been laid off as early as 1722, but it was certainly resurveyed in 1768; and as the Court below rested the case upon the effect of the resurvey, as equivalent to an original appropriation, I presume the case' does not require that we should look beyond it. *296 The titles under which the defendants below (and plaintiffs in appeal,) defend their possession, originated in 1747 and 1748, and would be entitled to unquestionable precedence, but for the following facts: The warrants of survey contain a condition in these words, “ which survey, in case the said A. B. fulfil the above agreement within six months from the date hereof, shall be valid, otherwise void.” The agreement here referred to. was, to pay a sum of money, (called, with reference to its fixed amount, the common terms,) in six months. A portion, about one third, of this sum, it. appears, was paid, but there was nothing in the cause to sustain the payment of the residue, unless it was possession, lapse of time, and supposed acquiescence of the proprietaries. When the manor was surveyed in 1768, there were many of these individual land-holders comprized within the lines then laid off, all holding on the common terms; and there were, afterwards, many other tracts sold, upon what are called, in the peculiar language of that country, the terms agreed ; by which is understood, according to a value to be adjusted, without confining the vendor to the common terms. Such tracts were sold out to the purchasers of this class, as Penn’s individual property. Upon all these lands there were reserved a small annual sum, called quit-rents. In the year 1779, the Legislature passed an act, entitled, an act “ for vesting the estates of the late proprietaries of Pennsylvania in this Commonwealth,” by one section of which, the proprietary tenths, or manors, are granted to the proprietaries. “ toge- *297 tier with the quit-rents and other rents reserved thereon.” By another, all the lands of the State, except those within the tenths or manors, are exempted from quit-rents, and released from any lien for balances of purchase money, which purchase money is vested in the Commonwealth.
The question is, whether the lands within the manors, granted out to individuals previous to surveying the manors, are entitled to the benefit of these exemptions, in common with all lands of the same class within the State; and the action below is an attempt to exclude from that benefit those prior grantees, under the idea that they are excepted by the effect of the reservations in favour of the proprietaries. And this supposed right of the proprietaries is asserted through the medium of an action of ejectment, under the idea that the legal estate is in the grantee of the manor, and only an equitable interest in. the tenant, the prior purchaser.
The received doctrines on the subject of what creates a legal estate in a grantee, it must be observed, are altogether peculiar in the State of Pennsylvania. A warrant, a survey, and.payment of the consideration money, is held to give an absolute estate in fee, though not consummated by . a patent. This subject came on to be considered by this Court, as early as the year 1799; and the law was then clearly recognised. to be as I here state it. Judge Iredell uses the expression, as applied to a title so acquired, “ a legal title, >as distinguished from an equitable title.”
*298 The peculiarities of the. form in which this question comes up, must be attributed to local practice. The charge given by the Court, on summing up to the jury, is copied into the record, and exceptions taken to those parts of it which were unfavourable to the defendants below. These exceptions were ten,in number; but only the 4th, 7th, 8th, and 10th, have been insisted on in argument here. Of these,. I consider the last in numerical order as proper first to be noticed. It is expressed in these words: “ Because the evidence exhibited manifested the absence of legal title in the plaintiffs lessee, whereas the Court charged the jury, that he was possessed of the legal title, and as such, entitled to recover in this action.”
The Court below has considered the title of the defendants below as a mere equitable title; all its conclusions, from first to last, have their basis in this doctrine. And had it been shown in argument that this idea was sustained by a course of decisions in the State Courts, I certainly should not feel myself at liberty to contest it. But every thing conspires to satisfy me, that the estate vested in the warrantee upon the execution of a-survey, was never considered in any other light than a legal estate, in the jurisprudence of that country. Whatever may be the correct legal construction of the words of the warrant, if such has been the practical construction, communis error facitjus, and it is now too late to criticise on the meaning of terms.
*299 My reasons for adopting this opinion arc the following:
1. I look in vain through the statutes of that State, for any legal provision for entering, avoiding, and regranting lands, for failure in paying the arrears of purchase money. On the contrary. I find an act passed on the 9th of April, 1751. which furnishes a legislative exposition of the law on this subject. By the provisions of that act. the treasurer is authorized to issue an execution for the arrears of purchase money due on lands granted prior to the 10th of December, 1776, and to levy on and sell the land so granted. Thai the warrants and survey created in favour of the State a debt and a lien, is unquestionable; and this is all that the State affirms in passing this law; but, by the same legal provision, it negatives the idea of the property in the soil having ceased to exist in the tenant. No change in this respect was effected by the act of 1779, commonly called the vesting act, since that act only confirms individual estates according to their existing qualities.
Nor has the legislative power been altogether silent on the subject of forfeiture and regranting: for, by the 10th article of the concessions, there is provision made for regranling lands which may become forfeited for failing, for three years, to seat and improve them. Nor do I believe that there can be produced in the history of the jurisprudence of that country, an instance in which this power of regranting has been extended to any other case.
*300 2. I think this opinion follows as a corollary to thé proposition, that payment of the consideration money vests a legal estate. For why should a patent be unnecessary, if there remained any act to be done on the part of the proprietary, in order to pass a legal estate ? It may be contended, that this doctrine results from the péóuliar jurisprudence of that State, in which, for want of Courts of equity, the Courts of law have adopted the maxim, that we must consider that as done which ought to be done. But to this there is a brief and unanswerable reply. Such might be the reason where a patent is demanded, and the fees tendered; but such demand and tender have never been insisted on as necessary in support of the general effect of payment of the consideration money, to vest a fee simple absolute, without a patent.
Some analogy may be supposed to exist between this case, and that of mortgagor and mortgagee. But, if so, the relation is reversed, and the converse of the rights and liabilities of the mortgagee results from it. For, the debtor conveys the fee to the creditor, in the ordinary form of mortgaging, and retains only the right to redeem. Here the creditor conveys the estate cum onere. And the question as to the interest vested in the defendants below, whether it was legal or equitable, still recurs. If legal, it bears an analogy with an estate in fee subject to a charge, rather than to an estate subject to a mortgage; in which former case, the creditor could not maintain ejectment.
*301 The only analogy, in my judgment, between this estate and any one known to the common law, is that of a feoffment o n condition. The warrant is the deed, the survey the livery of seisin; and the condition is a condition in deed, as distinguished from a condition in law; and it is also a condition subsequent. In which case, it is clear, that the estste is a legal estate, and remains good until ent’ y made for the forfeiture, by some one legally authorized. This leads to the questions, whether, previous to their formal entry on bringing this ejectment, such an entry was made ? Whether legally made ? And what were its legal effects ?
Unless the manorial appropriation of 1768 can be considered as an entry, it is not pretended that any legal eviction of the defendants below ever took place. And as to that, I think it perfectly clear, that it could, on no principle, operate as a legal eviction. It was an act, on every principle, perfectly consistent with the full and unmolested enjoyment of the premises in question . And this consequence follows, whether we consider it in the light of a simple designation of metes and bounds, over which the original proprietary rights were retained, or, what appears to be the more proper view, as an original grant, converting it from an interest existing in the proprietary, in his political capacity, into an estate held by him in his individual relations to the society, of which he was both a member and a ruler. In the first view, there was no sensible change made in the estate, as it existed previously in this, and the whole ter *302 ritory; and in the second, the interest acquired, or effect produced, could be nothing beyond that of a grant to any individual, other than the proprietary. In the latter case, it is perfectly clear, that running the circumscribing lines, would be no trespass or eviction. These appropriations to the proprietary, were intended to operate exclusively upon unseated territory. On that which had been, previously surveyed to individuals, they oould produce no effect whatever ; otherwise they' might as well have dispossessed those who held by a perfect, as those who held by an inchoate title. Although circumscribed by the lines of the manor, the seated tracts composed no part of the thing appropriated; they could not have been estimated as any part of the proprietary’s tenths; and there never was a doubt of his right having still existed, to extend the limits of his survey, so as to take in as much land as he was deprived of by these prior included individual appropriations. A different construction would be greatly to his prejudice, inasmuch as he might, by possibility, have lost the whole of his tenths, by taking in the grants to others. This view of the subject, I shall again have reason to recur to, on another point.
But, if this circumscribing.survey could, on any principle, be held equivalent to an entry, it is still necessary to maintain that it was a legal entry. And this I am prepared to negative, upon various grounds. It is obvio: , tha't such an entry must be justified, either on the ground cf personal right oi legal power. A mere arbitrary power to resurvey, did t exist in the pro <riei.ary : the province *303 of Pennsylvania had taken the form of a State, governed by a wise and beneficent government, in which the will of the proprietary had been subjected to the public will, and his allodial interests circumscribed to his purchase money and quit-rents, and his reserved tenths. As to the land seated under warrants to individuals, he was bound by his own concessions and the legislativé will ; and I see no power delegated by law to any one to enter and evict for failure to pay the considerar tion money reserved on such appropriations ; nor have we been told of any practice on this subject, that could be construed into a national acquiescence, in the exercise of such a power. The debt, and the lien remained, but the right of eviction and regranting foi non-payment, was never legalized nor asserted, nor could it, in any case, have been tolerated, without a tender of that part of the consideration money which had been already paid. Again, an entry for condition broken, must be made as such, and-with intent to produce the legal effects of an entry; a mere casual friendly passing, of the boundaries of the premises will be uncon-sequential; but here, the sole object of the survey of 1768, was to appropriate unseated land, and not to assert a title to that which had been previously appropriated. The present claim is but an after thought; a speculation upon the possible effect of an act not intended to produce eviction.
This leads to another consideration, operating against both the fact and legality of this supposed entry; for condition broken. It is agreed, on all hands, that proof of the full payment, of the con *304 sideration money, would have been conclusive against the title of the plaintiffs below. But why may not presumption of such a payment arise from length of time and acquiescence ? and that of the plaintiff below be left as a fact to the jury P If resumption of a patent may, under circumstances, be left to a jury in favour of possession, much more so may a fact so much less solemn in its nature, and more difficult of proof, as payment. In this case, and in all cases arising in Penhsylvania, such a fact may well be submitted, since in. practice it has superseded the issuing of a patent, and may well tempt the parsimony of purchasers, since the expense of a patent has become an expense of supererogation. The long forbearance and acquiescence of the proprietaries, can be referred only to one of three causes : a consciousness that they had acquired nothing in the seated lands within their manorial appropriations; that they had no right to enter on the premises previously seated; or, that the title in^it was perfected by payment. All which would operate against both the fact and legality of the supposed entry.
From these considerations, I am led to adopt the opinion, that the title of the defendants below was a legal title, and the better title; that Avoidable, it could be avoided, only by entry for conditions broken. That no such entry was made, or was intended to be made, or could be legally nüade ; and that they were, therefore, entitled to a charge in their favour.. With this view of the subject, it may hot be necessary for me to go farther. But it comports' with the practice of this *305 Court, that I should express an opinion on the other points in the cause.
And first, as to the bearing of the act of confiscation, on the subject of this suit.
The Court below appears to have considered a manor in the light of a geographical tract, or portion of territory designated by metes and bounds. I, on the contrary, consider the term as designating an estate or legal interest within the geographical limits. In this sense, nothing will be com-prized . in the meaning of the words of the 8th section of the law, but those tracts of land within those limits which were held of the manor; or, in the peculiar language of that country, granted on terms to be agreed. It is very clear, that the 8th section of the act of confiscation was not intended to convey to the proprietaries any interest hot previously existing in them. Now, how did á manorial appropriation operate upon the lands that had been seated previous to such appropriations ? It is clear that it vested no interest in such lands, nor any thing incident to them.. If the whole purchase money had been paid, the individual’s estate was consummated. And if the whole was not paid, it is admitted in the charge, that the proprietary could not change the tenure or the terms of purchase. And so far were these previously seated tracts from being considered in law as making part of the manor, that the proprietary’s right to indemnify himself from adjacent unseated territory, for the deduction from his tenths, caused by these excepted tracts, has been solemnly recognised in that Court. Then. *306 though within the manor, they were not of the manor; as well might.an island or an oasis be denominated water or desert. And there were unanswerable reasons, in justice and policy, why such land should have been so considered. It is asserted that the proprietaries never, in fact, exercised any of those privileges and powers within the tracts denominated manors, which were authorized by the charter. But this consideration has no influence upon my opinion; for, 1st, I see no reason, except the intervention of the revolution, why the proprietáries, or lords of the manors, may not have assumed the exercise of those privileges. In case of escheats,’there can be no doubt that they would have asserted one manorial right, and were probably prevented from asserting all, only because in the actual state of the province, they would have been burthensome, and unproductive. But, 2dly, They did assert one important privilege within those limits, a privilege which they were precluded by law from exercising beyond those limits. This was the right to demand a higher price for the lands within their manors, than that to which they had restricted themselves in the State at large. And this appears to me to establish a familiar and definite ground of discrimination, by which to determine the operation of this act of confiscation, in any given case. Was the land held on the common terms, or the terms agreed? It cannot be disputed that the general purpose of the act of confiscation was, to distinguish between the land appropriated to the individual,úse of the proprie- *307 tañes, and that over wlneli they were held to exercise only a political power, or fiduciary interest. They were, permitted to acquire an indiridual property in one tenth of the territory of the State ; and the lands so appropriated, as well as the proceeds of the sale of such lands, were, meant to be set apart to them, while that which had been seated by individuals, as a part of the unappropriated nine tenths, reserved to the community, was intended to be confiscated. Any other construction would go to imply, that the State had reserved to the proprietaries, territory which was no part of their legal tenths; and, also, that but for this reservation, the act of confiscation would have devested individual interests not intended to be confiscated.
But let us examine more, particularly the provisions of This act, with a view to determining its just construction. And here let me premise, that, for all the purposes of this suit, I care not whether the 9th section of the act vests in the proprietaries the balances due on the tracts within the manor, sold on the common terms, , or not. The question here is, whether they are entitled to judgment in a suit in ejectment, and of consequence, to a writ of possession, for I cannot dis-tingüish the one. from the other. I wholly reject the doctrine of suing for possession, and recovering money; of suing for land, and recovering pounds, shillings and pence. Such a perversion of means might proceed from positive legislation; and, in the State of Pennsylvania, where an amalgamation of law' and equity necessarily, grows out of *308 the want of an equity jurisdiction, the practice has grown up, of giving an alternative judgment in such cases,, for either the land or the money, or rather for the money to be levied on the l id. But this Court is expressly prohibited from thus confounding legal and equitable proceedings, and the whole opinion of the Court below proceeds on a recognition of the necessity of pursuing the two classes of legal and equitable rights, by their appropriate remedies. I have said, and in this I do not understand myself as differing from this Court, that the only practical effect of the terms of the warrants to individuals is, to create a debt and a lien ; but surely a tenant may covenant to stand seised, subject to a charge in gross, and yet retain the legal estate. And even in the ordinary case of a mortgage, where the legal estate passes from the debtor to the creditor, and the converse of the present case exists, an assignment of the debt is no conveyance of the legal estate to the assignee. A Court of equity will pass the one as an incident to the other; but in a Court of law, the assignee could not maintain ejectment. And that is the only question here. If it be said, that although in this suit the plaintiff below may not be entitled to recover the land, but may avail himself, of this form of action to recover the purchase money due, I consider it as an abandonment of the question ; for, the debt, if existing, was but . an equitable lien, and the remedy here resorted to, is a common law remedy. I think, however, I shall show, that although the debt exists, the lien is taken away by the act of confiscation; and *309 though the debt be due, it is not due to these parties, but to the Commonwealth of Pennsylvania.
In following this act of confiscation through the detail of its provisions, we find, that after four sections, setting forth the views and motives of the Legislature, the fifth section, or first enacting clause, contains a general assumption of the soil and sovereignty of the State, and. a revocation of the charter to Penn, as fully, to use its own language, “ as if the same were therein transcribed and repealed.” The sixth section asserts the future exclusive appropriation of the “soil and lands, here-ditaments and premises, to be in the Legislature of the Statearid, under the operation of these two clauses, it is very clear, that every right, civil and political, of the proprietaries, “of, in, or to the soil” of Pennsylvania, derived under the charter, was (subject to the exceptions in the same act) vested in the Commonwealth, “ freed and discharged,” as the act expresses it, “ from and against all estate^ uses, trusts,” “charges,- incumbrances, titles, claims, and demands whatsoever.” And all the title which they now hold therein, they hold by virtue of the provisoes contained in the 8th and 9th sections. But to understand the force and meaning of those two sections, I deem it material, that the language and effect of the 7th section should be duly weighed. This section contains a general corifirmation of all the estates, legal and equitable, derived from the proprietaries, their officers, &e. or otherwise, or to which any person or persons, other than the proprietaries, were entitled, either by deed, patent, warrant, or survey. *310 on the 4th of July, 1776. This clause operates in favour of all persons “ other than the proprietaries,” and confirms, unquestionably, the estates of these defendants below, in common with every other citizen. The next proviso, (8th section,) is confined to the subject of the estates and interests of the proprietaries, And here it is obvious, that three subjects claimed the attention of the Legislature. Their estates and interests were distributable into three classes : they held property acquired, in common with every other individual, “ by devise, purchase, descent,” &c.; they held other property, under the reservation of a tenth of the soil, to their individual use ; and they held, or claimed, a third class of interests, as proprietaries, which clashed with that eminent domain, which was now about to be assumed by the State of Pennsylvania. The latter, the State determined to confiscate, and compensate them for; the former two, to preserve to them unviolated. And these considerations draw a line of demarkation between the subjects of this act, infinitely more definite and rational, than that marked out by trees or streams. The estates held upon the common terms, were those which constituted the third class; and the phraseology of the act appears to me to be in perfect. accordance with the . general intent. On litis point, I hold it to be an important fact, that, without exception, throughout these two sections, tenths and manors are never used apart; they are constantly considered synonimous and equivalent. Now, although a manor may, by common ácceptation, be considered as a geographical section, o. *311 tenth is a term of comparison and quantity, and has direct relation to that interest which the proprietaries had acquired, and might acquire, asa distinct individual property in the soil. I consider, therefore,- both manor and tenth, as here used, as designating estate and interest, and not geographical limits. And why should it be held a reservation, by geographical limits ? Let it be remarked, that it is no immaterial question to the defendants in the Court below, not only as it af- . fects their interests, but as it affects their claims upon the justice and impartial legislation of country. There can be no reason assigned, why they should be excluded from the benefits which this act confers upon citizens of their class, and, in fact, subjected To confiscation. There are important interests growing out of this act to all other landholders, upon common terms ; they are exempted from quit-rents, and the lien for the balance of purchase money is taken from off their lands. Can there be a reason assigned, why those of this class who, by the caprice or cupidity of the . proprietaries, or their agents, have been embraced, within the lines of their surveys, should be excluded from the common benefits extended to their fellow citizens ? The injustice of such a discrimination is conclusive on the construction of thea ct, if an act is to be construed according to the intent, of the Legislature. With regard to those who held of the manor, or held, as is usually said, on terms .agreed, the case is widely different. It is the effect of their own individual contracts with the proprietary. They are, by the nature of, *312 their relation to the proprietaries, distinguished from those of the other class, and have nothing to comP,ain Their quit-rents and arrears were considered as debes due to their landlord, and the Legislature intended to take from the Penns nothing which belonged to them in their individual capacity.
Again; extending the construction of the act to the geographical limits of the manor, leads to the most absurd consequences.
It has been insisted, that ;it was lawful, in surveying the. manors, to include within their boundaries the grants to individuals. This is readily conceded ; and the inference from the fact, is directly the reverse of what has been attributed to it. Did the Legislature mean, by the proviso in favour of the Penns, to reserve to them their legi-. tímate tenths ; or did they mean, by possibility, to reserve to them half the State ? There cannot be a doubt that, although any particular survey had embraced half a county, yet if the vacant land within it had amounted to no more than a tenth, the appropriation would have been duly made, and valid. But could the Legislature ever have intended to exclude all the individuals thus circumscribed, from the-common benefits of grantees on the common terms? to have subjected them to the most odious and unmerited exceptions? Could the State have intended to.permit the proprietaries, under the pretext of surveying a tenth, to cast their net over half its limits ? It was for the very reason that including individual surveys made them no part of the manor, that the right to include previous *313 locátions to individuals was tolerated. It had not entered into the mind of man to conceive, that they thereby produced any change in the relation which subsisted between those individuals and the Commonwealth; or could expose them to be separated from the mass of the community, in the several legislation of the State ; or exclude them from an equal participation in all the benefits of the revolution. But by this. geographical construction, without any act or offence on their part, they are shut out from immunities extended to others, who. had no greater claims upon the community than themselves.
But again; if we are to construe this act without a reference to its general spirit and intent, we have but to carry the principle through, in order to involve us in irreconcilable absurdity, and such as will oblige us, for the purpose of common sense, to come back to the very principle of construction which I would apply to the law. throughout. A liberal construction of the 8th section, vests in the Penns the whole geographical contents of their manors, whether sold or unsold; and then adds to the grant the rents reserved out of the parts sold. The words are, “ All the lands, &c. duly surveyed, &c., together with the quit or other rents, or arrearages of rent, reserved out of the said proprietary tenths, or manors, or any part or parts thereof sold.” Now, to reduce this section to the standard.of common sense, we have at once to reject the geographical limits, and circumscribe the thing granted to the estate or interest existing in the Penns at the time specified, *314 Nor is it immaterial, to note the. particular phraseology here made use of. The words are, “reserved out of the said proprietary tenths, or manors, or the part or parts thereof which have been sold.” Now the lands sold to these defendants below, were sold out of the general funds of the State, and the quit-rent on these was reserved out of the land of the State, and not of the manor, for that had no legal existence when this sale and reservation Were made. The land was not sold as part of the manor, nor was. the rent reserved out of part of ,the manor.
But, secondly; there is. not a pretext for this supposed resulting legal estate in the Penns, except the assumed reservation to them of the balance of purchase money on the grants held within their lines upon common terms. And how does this stand ? It will be found tobe only an implied grant, to which this implied legal estate, is appended ; an implication tacked to another implication ; and finally, as the concluding link of this ehain of implication, that ejectment is the remedy reserved for the recovery of that balance , of the purchase money, which is itself the subject of the first implication.
If the rights of the Penns be circumscribed by the- positive enactments of this law, then are they not only precluded from all claim to the balances due by this class of grantees, but also from those due by every description of purchasers ; for there is no positive provision in the law which vests those balances in them..' Their quit-rents are expressly reserved to them in the manors, but not so. *315 with their balances of purchase money. But in the 9th and 10th sections, these arrearages of purchase money are excepted from the provisions of the law, without any express declaration to whom they shall belong; and from this, an implication is supposed to result in their favour. But surely, so far as relates to the balances due by the general grantees, the implication is so far from being a necessary implication, that its bearing is altogether the other way; the implied intent of the Legislature is against a construction so obviously inconsistent with the general purposes of that body; a construction producing such an unjust, unreasonable, and improbable discrimination between innocent and equally meritorious men of the same class. Construe the act so as to confine the grant to the Penns to their private interests in the manors, and it becomes sensible and consistent throughout; and while it secures to them, on the one hand, all the interests which, as individuals, they are entitled to; on the other hand, you extend to all other individual citizens, one uniform r6le of legislation and relief.
Again; there is no reason for supposing that when the Legislature uses the terms tenth's and manors aforesaid, in the 9th section, or the said tenths and manors, in the 10th section, that it uses them in any other sense than that in which they areusedin the 8thsection. The termsused, infact, identify their, meaning. But a correct construction of the terms used in the 8th section, in describing these tenths, or manors-, is fatal to all implication in favour of the Penns, with reference, to any *316 interest in the lands legally seated, previous to their appropriation. The words are, “ tenths, or manors> duly surveyed and returned into the land office.” But who will deny, that these words áre to be construed with reference to the intent and effect of such surveys? And what was that intent and effect? simply to appropriate unseated lands. Would these proprietaries have been content in laying off these surveys, to have been precluded and deprived of half their interest by previous surveys, over which they could not have exercised the right of selling pr retaining, as they thought proper ? If not, then, so far as relates to previously ceded lands, they never were appropriated by them, and it cannot be predicated of them, that in the sense of the parties they were surveyed atid returned.
The construction now contended for, is obviously an after thought of the plaintiffs below, growing entirely out of a supposed ambiguity in the words of the confiscation act, ánd would , have been strenuously resisted, had they been so applied when their surveys of manors were first made.
Again; the rule of construction applicable to leases and wills are not essentially different in their principles. In legislating on this subject, the State had assumed all the rights, and, at least, could exercise all the powers of a. manor-holder, in making his last will. Although by the charter, the purchasers, under manors are restricted from any . alienation of their, purchases, by which they might be devested of the incident of holding directly of the manor, it is obvious that such a change of *317 estate might be produced, by the act of the manor-holder. Suppose, then, the grantees of the manor of. Spriugétsbury had sold any portion of the soil, and devested it of this incident, lying, we may suppose, in the very centre of the whole, would a devise in the very words of this act, “ to wit, of the manor of Springetsbiiry, ¿s duly surveyed and returned,” have been construed to carry the portion previously disposed of ? Or, to pursue the analogy further; suppose the purchase money unpaid, and a covenant by indenture of the tenant to pay the money to the vendor and his heirs, and even to hold the land charged with the payment, would a devise of the manor carry the money so reserved, or the devise of the debt carry the freehold in the land sold ?
But, on this doctrine of implication I will make another observation. It is rebutted by the provisions of. the instrument itself; and, in the case of a will, would be considered as an undisposed residue ; for, when we look through the whole act, and find this 8th section to be the only one which purports to give any thing to the proprietaries, their whole interest having been previously confiscated; and when, in this section, we find their individual interests in the soil of the State, whether acquired as other individuals, or as proprietary appropriations, carefully designated, and even to the arrearages of quit-rents on such lands, expressly reserved to them ; surely the implication arises,' that this section was intended to embrace . the whole provision meant to be made for them out of the common patrimony' of the State.
*318 The omission to mention and reserve the ar-rearages of purchase money due on the manorial sales, might, with much greater reason, be urged as raising a presúmption against their claims even to those balances. This, however, I reject; and for a reason which serves to throw some light upon the subsequent clauses of this statute; which is, that as the Legislature, in so many words, recognises these alienations as individual sales,' they very properly considered the balances due thereon as private debts; and, as no confiscation of private debts could be implied from the enacting clauses of the act, so no express reservation of such balances was deemed necessary. The subsequent exceptions in favour of balances due on manorial lands, therefore, I consider as intended only to guard, against an extension of the words of the law to such individual contracts. The nine tenths of the soil, and . the balances of purchase money due on such parts as had passed to individuals, they considered as the property of the body politic, and appropriated it as such to the Statei ‘ The one tenth set apart for the proprietaries, they propose to put on the same footing with their individual interests, pr operly so called, and with it, to reserve, to them the balances due on the lands appropriated to themselves. These are fair 'and consistent inferences, if not . positive enactments; but it would be much more consistent with the positive enactments, to hold, that all the balances due on the lands circumscribed by the manorial lines, were still at the disposition of the Legislature, than that they meant to *319 confer on the Penns more than they have declared, or made discriminations among the citizens at large, which no reason or policy could justify.
Upon the questions that have been raised upon the operation of the law, commonly called the seven years law, or the law of 1705, (though of much greater antiquity,) it may be proper to make a few remarks.
I cannot see a reason why this law should have been supposed obsolete, more especially with reference to the early day in which it must have acted upon the interests of the parties in this cause. On the contrary, it appears to have been a favourite law of the colony, for we find it enacted and re-enacted, in opposition to reiterated repeals by the King in council, as will be seen by reference to Carey and Bioren’s edition of the Laws. In the same work, we find it printed under sanction of the Legislature, and republished under the same authority, as lately as 1810. Indeed, upon reference to the concessions which composed the fundamental laws of the colony, we find the very law in its present terms; and are led to the conclusion, that ifs constitutional character gave it a peculiar sanctity in the eyes of tfie Commonwealth. Another consequence, also, results from its very early enactment; which is, that, contrary to a ground taken in argument, it must be construed as having a prospective effect, since it was adopted at a time when there could not have existed a case for it to govern, if solely -retrospective. Of this law it has been remarked, that for 116 years it does not appear that a cause *320 has been won or lost on the basis of it. And had the decisions of the State Courts, prior to the revolution, been preserved, the observation would have had its influence. But in the absence of reports of such adjudications, there cannot exist such satisfactory evidence on the subject as to sustain the fact. One thing is very certain, that some beneficial influence must have been felt from its existence, or it would not have been so often and so pertinaciously insisted on by the colonists. If it covered their estates in no other way than by preventing suits, its great purposes were answered; and its sovereign influence, in this respect, may well be inferred, from the assumed non-existence of decisions at law. It preserved health, if it did not cure disease. At present, it is unquestionably repealed by the act of 1785, for the. two acts cannot stand together. The latter act extends the limitation of suits to twenty-one years; but if the limitation of. seven years woüld produce the same effect, then would the prior law repeal the latter, or render it a mere nullity. And this accounts,for its not having been heard of for the last forty years, which may be called the period of reported causes. Its repeal, however, at that time, has no influence upon its previous effect upon the rights of these partios.
It has been remarked of this láw, as incontestable, that it could not convert an equitable into a legal estate: But-this doctrine appears to me to do more than render the law Obsolete; it renders it a mere nullity in its origin. What is gained by an estate’s continuing an equitable estate ? From *321 its inherent strength, unaided by the law, if accompanied with continued possession, it would continue a good equitable estate ; and why should not the comprehensive words, “ shall for ever give an unquestionable title against all,” be construed into a transmutation from an equitable into a legal title? How can any but a good legal title be denominated an unquestionable title? and why should not all comprise Iqgal as well as equitable claimants? The opinion below supposes the signification of those terms to be circumscribed by the words “ during thé estate.” But from this I must dissent, since these words do not necessarily convey that meaning, and are more properly applied to the distinction of estate^ into terms for years, estates for life, estates in fee, in tail, &c.; all which may be. either legal or equitable. Neither can I acquiesce in that part of the opinion, which considers a discharge from the purchase money of the land, ás a necessary consequence of giving effect to the seven years law, as agairst the plaintiffs below in this cause; for the lien might continue, though a legal and absolute estate be vested in the defendants below. And, to prevent the operation of this law in favour of the possession, lest the claim for the purchase money should incidentally be. barred, appears to be inverting the order of things; for, by the acts limiting suits on contracts, the suit for the purchase money might . by possibility ‘be barred; while the remedy to recover the land was still in full force, being of longer duration. The superior purpose of quieting estates of freehold, also would, under that *322 doctrine, be controlled by the inferior one of enforcing open contracts, or implied covenants. While the most ordinary means of adjusting contracts for the sale of lands on credit remained in practice, there could be no danger, in giving credit on sales, of losing both land and money, as the Court supposes. But if that consequence did follow, non constat, but that the public interest, as well as private tranquillity, might have been promoted by it.
To me it appears, that this seven years law has had a sovereign influence over the rights of property in that State. I have no doubt that it is under its influence the doctrine has grown up, that a possessor of the soil need not produce a patent to protect his freehold ; as well as the doctrine, that those words which, on the face of the warrant, would seem a condition, shall not be held to produce n ore than a contract and a lien.
But if this se en years law did not quiet the possessie ff the defendants below, I confess I am at a loss to understand the principle upon which, that effect is denied to the limitation act of 1785. Was their estate void or voidable, legal or equitable? In every point of view, the law appears to me to operate in their favour.
The opinion below is thus expressed: “ Possession, to create a bar by length of time, must be adverse, which it cannot be, if the defendant’s entry was under a title derived from the plain-tiffsThat a possession, to sustain a bar under the act, must be adverse, is unquestionable. But when the Court comes, in the next member of the *323 period, to explain what is meant by an adverse possession, we find the doctrine asserted, that a possession cannot, be held adverse to the title of him from whom it is derived. This doótrine I hold to be altogether untenable; and this sentence alone, though every other idea be put out of the case, would, in my view of the subject, entitle the plaintiffs here to a reversal of the judgment. The title acquired by a vendee is most peculiarly adverse to that of him from whom he purchases.
But under what view of the subject could these plaintiffs be held mere tenants at will to the parties plaintiffs below? or their possession any other than an adverse , possession ? They did not hold as the agents or representatives of those through whom they derived the title. From the time of entering into possession, they held in virtue of the estate in themselves, and not that of • any other, If the idea is, that the proprietaries might at any time have entered upon them, and in that sense, the estate was held at their will, the answer is, that is one of the very .cases that the act of limitation provides against; for it takes away that volition in the proprietary, unless the entry be made in twenty-one years. But the fact was not so ; these tenants did not hold at the will of the.proprietaries, for all those who acquired under the common terms were taken under the care of ,the law. and we find act upon act to regulate the proceedings of the proprietary towards them. The right to turn them out by the shoulders never existed in the proprietary ; he must have resorted to his entry, or suit, to recover possession; they were *324 considered as holding a freehold, and the law did not entitle him to resume possession arbitrarily, It was the doctrine of that State, that his rights were restricted to the payment of the purchase money and quit-rents, at least until he tendered a return of advances and improvements. It cannot be imagined that the reservation of quit-rents converted the purchasers into tenants at willneither principle nor authority would sanction the idea. Nor can I perceive any thing either in the legal relations or contracts of these parties, that could sustain the doctrine that the possession of the defendants was permissive, and identified with that of the proprietary. A tenancy at will, must be the result of contract, express or implied.; but a freehold granted on condition, is not converted by forfeiture into a tenancy at will. Yet, had it been otherwise, surely lapse of time, general acquiescence, and received opinion, ought tobe held to produce the same cansequences as to the tenure of property in * this State, which were produced by the same causes in England upon the tenure by copy of court-roll. That which was in its origin nothing but a tenure at will, retains now nothing of its órigin but the formula which attests its history. .
To conclude • let the estate of these defendants below be considered as either void or voidable, and I see not how the act of limitations is to be escaped by their, antagonist.. If voidable, on failure to pay the purchase money, the entry, is expressly taken away by that statute; and if void, they cannot bo reduced lower than to the grade *325 of tenants by sufferance, with regard to whom entry and suit was just as indispensable, as with regard to any other tenure. (Co. Lit. 57.) In the application of the doctrinos on the statute of limitations, the incidents to the two tenures ought not to be confounded.
Judgment affirmed.